

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:20-CR-234 |
| ) | |
| DANIEL TYLER WALKER, ) | |
| ) | |
| Defendant. ) | |

**STATEMENT OF FACTS**

The United States and the defendant, DANIEL TYLER WALKER ("WALKER"), stipulate that the allegations in the Criminal Information and the following facts are true and correct. The parties further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I.   Introduction**

1.   From in or around 2015 to in or around 2017, WALKER worked as a medical sales specialist for Pharmaceutical Company A, which is headquartered in the Eastern District of Virginia. WALKER was responsible for marketing a naloxone auto-injector device that Pharmaceutical Company A developed and used for the treatment of opioid emergencies. This naloxone auto-injector device was marketed to health care providers, pharmacies, and individuals. In or around February 2016, Pharmaceutical Company A raised the price of this naloxone auto-injector device to over $3,000 per unit, which included two (2) auto-injectors and a training device.

2.   Royal Care Pharmacy ("Royal Care") was located in Fairfax, Virginia, within the Eastern District of Virginia. Royal Care was owned and operated by MOHAMED ABDALLA

("ABDALLA"), a pharmacist licensed in the Commonwealth of Virginia since in or around May 2008. Royal Care filled prescriptions for patients' medications provided through various sources. ABDALLA further used Royal Care to conduct business on behalf of MEDEX Health Group ("MEDEX").

3. Millennium Pharmacy ("Millennium") was located in Falls Church, Virginia, within the Eastern District of Virginia. Millennium was owned by ABDALLA and S.H. S.H. is a physician licensed in the Commonwealth of Virginia since in or around April 1999. Millennium filled prescriptions for patients' medications provided through various sources.

4. Pharmacy at Great Falls ("Great Falls") was located in Great Falls, Virginia, within the Eastern District of Virginia. Great Falls was owned in name by L.V., the parent-in-law of ABDALLA. L.V. was listed as the owner of Great Falls to conceal ABDALLA's operating role in the pharmacy.

5. In or around March 2019, the Virginia Board of Pharmacy ("VBP") cited Great Falls for having "…labels for prescriptions that were dispensed from Royal Care Pharmacy [but] did not contain information identifying all pharmacies involved in the filling and dispensing of the prescription." The VBP further claimed that Great Falls was not operating out of the location for which it held a permit. Instead, it was operating out of Royal Care's permitted space without filing an application with the VBP to change its location.

6. MOHAMMED TARIQ AMIN ("AMIN") is a licensed pharmacy technician in the Commonwealth of Virginia since in or around March 2007. From on or about November 20, 2014, to on or about November 7, 2018, AMIN served as Royal Care's general manager and was responsible for overseeing, controlling, and managing the day-to-day operations of the pharmacy.

7. Medicare, Virginia Medicaid, and Maryland Medicaid, and TRICARE ("Tricare")

2

are federal health care programs funded directly, in whole or in part, by the United States Government, or a state health care program, as defined by Title 42, United States Code, Section 1320a-7b(f). Medicare, Virginia Medicaid, Maryland Medicaid, and Tricare are also federal health care programs as defined by Title 18, United States Code, Section 24(b).

## II. Criminal Conduct

*The Conspiracy to Violate the Anti-Kickback Statute*

8. From at least in or around August 2016 and continuing until at least in or around February 2018, in the Eastern District of Virginia and elsewhere, WALKER knowingly and willfully did combine, conspire, confederate and agree with ABDALLA, AMIN, and others, known and unknown, to commit the following offense against the United States, that is, the violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to induce WALKER to direct health care providers and other individuals to refer patients to and fill prescriptions through Royal Care for the furnishing of items and services for which payment may be made in whole or in part under, Medicare, Virginia Medicaid, and Maryland Medicaid, federal health care programs.

9. More specifically, during the conspiracy, WALKER and his conspirators, including AMIN and ABDALLA, caused kickbacks to be paid to WALKER in exchange for referring and directing health care providers and other individuals to have prescriptions for certain drugs, namely this naloxone auto-injector device, filled through Royal Care and disguised the kickbacks using various means.

10. On or about August 2016, WALKER and his conspirators entered into an agreement whereby Royal Care would compensate WALKER 25 percent of all net sales of every prescription of this naloxone auto-injector device directed to and filled by Royal Care.

11. For example, in or around August 2017, several of the impacted federal health care programs, namely, Medicare, Virginia Medicaid, and Maryland Medicaid paid Royal Care approximately $813,810.98 for 148 prescriptions for this naloxone auto-injector device. On or about September 14, 2017, a deposit for $52,847.82 from MEDEX posted to WALKER's bank account with a transaction memo titled "August." August referred to kickback payments related to this naloxone auto-injector device for August 2017.

12. During the life of the conspiracy, from on or about August 1, 2016, through on or about February 28, 2018, ongoing audits by prescription benefit managers prevented Royal Care from processing prescriptions for this naloxone auto-injector device. As a result of this impediment, ABDALLA and his conspirators diverted prescriptions to Millennium and Great Falls.

13. During the conspiracy, from on or about August 1, 2016, through on or about February 28, 2018, Royal Care, Millennium, and Great Falls received payments of about $9,928,261.62 from Medicare, Virginia Medicaid, Maryland Medicaid, and Tricare for claims submitted for prescriptions for this naloxone auto-injector device as a result of prescriptions directed to Royal Care pursuant to the kickback relationship with WALKER. During this period, Royal Care, Millennium, and Great Falls were paid as if they dispensed 2,319 dual pack boxes of this naloxone auto-injector device. The average retail cost of this naloxone auto-injector device during this time was $3,762.65. Thus, Royal Care, Millennium, and Great Falls profited approximately $1,202,676.27 from these prescriptions for this naloxone auto-injector device.

14. From on or about August 1, 2016, through on or about February 28, 2018, ABDALLA and his conspirators received payments of approximately $6,880,300.96 from Medicare, $1,157,777.54 from Tricare, $296,511.56 from Virginia Medicaid, and $1,593,671.56 from Maryland Medicaid for claims submitted to federal health benefit programs for prescriptions for this naloxone auto-injector device as a result of the kickback relationship with WALKER.

15. During the conspiracy, WALKER understood that prescriptions he directed others to fill through Royal Care would be submitted to and paid by federal health care benefit programs. On March 15, 2019, WALKER was interviewed by law enforcement and admitted that he knew the 25 percent of net sales of all prescriptions for this naloxone auto-injector device that he received as a result of the prescriptions, directed to and filled by Royal Care pursuant to the kickback arrangement, would include payments made to Royal Care from federal health care plans or programs, including Medicare, Virginia Medicaid, Maryland Medicaid, and Tricare.

16. WALKER received at least $573,558 from ABDALLA through MEDEX bank accounts in exchange for prescriptions for this naloxone auto-injector device filled by Royal Care. In addition, from in or around October 2017 through in or around September 2018, ABDALLA made payments of approximately $132,347 through AMIN's company, Innovative Pharmacy Solutions LLC, to WALKER in exchange for prescriptions for this naloxone auto-injector device filled by Royal Care. WALKER received at least $98,232 of these payments from AMIN.

17. While the conspiracy was ongoing, Pharmaceutical Company A, WALKER's employer, pursued an internal investigation of WALKER's relationship with Royal Care, including investigating whether WALKER was directing other sales representatives to send

business to a specific pharmacy, manipulating prescription timing for self-benefit, and engaging in communications that may imply a kickback relationship between WALKER and Royal Care.

18. During Pharmaceutical Company A's internal investigation, WALKER falsely denied the existence of a kickback relationship with Royal Care even though at the time, WALKER knew a kickback arrangement did in fact exist. Despite WALKER's denials, on February 3, 2017, Pharmaceutical Company A issued WALKER a final warning not to engage in conduct or "[c]ommunications that could imply a kickback" to healthcare providers and not to direct "other representatives to send business to a specific pharmacy." Furthermore, Pharmaceutical Company A directed WALKER to re-read and certify acknowledgement and understanding of Pharmaceutical Company A's healthcare compliance program. The compliance program included training on the federal Anti-kickback statute as well as settlements for "kickbacks to physicians to induce them to prescribe company's drug products."

19. Notwithstanding the internal investigation and additional training, WALKER continued to receive payments from ABDALLA and AMIN in exchange for prescriptions for this naloxone auto-injector device filled by Royal Care and reimbursed by federal health care programs through in or around February 2018.

20. On or around June 4, 2018, WALKER sent AMIN a text message demanding payment of $45,000, in kickbacks that Royal Care owed to WALKER from December 2017.

### III. Conclusion

21. The acts described above were done willfully and knowingly and with specific intent to violate the law, and not by accident, mistake, inadvertence, or other reason.

22. This Statement of Facts does not contain each and every fact known to WALKER and to the United States concerning WALKER's involvement in the conspiracy set forth in the plea agreement and this statement of facts.

23. This Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against WALKER regardless of whether the plea agreement is present to or accepted by the Court. Moreover, WALKER waives any rights that he may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 401, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,
G. Zachary Terwilliger
United States Attorney

By: *[signature]*
Jamar K. Walker
Monika Moore
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, DANIEL TYLER WALKER, and the United States, I hereby stipulate the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
DANIEL TYLER WALKER
Defendant


I am David Barger, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
David Barger, Esquire
Counsel for Defendant, Daniel Tyler Walker